UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVSION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2013 MAY 20  PM 4: 18

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | | |
|---|---|---|
| LEEWAY MEDIA GROUP, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. |
| | ) | |
| LAURENCE JOACHIM, an Individual and | ) | |
| TRANS-NATIONAL FILM CORPORATION, | ) | |
| a New York Corporation, | ) | **1:13 -cv- 0 8 2 2 JMS-TAB** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY RELIEF AND FOR SANCTIONS

Comes now Plaintiff LEEWAY MEDIA GROUP, LLC (hereinafter "LMG"), by counsel,
Theodore J. Minch, and for its Complaint for Declaratory Relief and for Sanctions (hereinafter
the "Complaint") as against Defendants LAURENCE JOACHIM, an Individual (hereinafter
"LJ") and TRANS-NATIONAL FILM CORPORATION (hereinafter "TNFC") (LJ and TNFC
may be hereinafter collectively referred to as the "Defendants"), LMG would respectfully show
the court as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      LMG is a limited liability company duly organized and existing under the laws of
the State of California with its principal office at 3384 Robertson Place, No. 100, Los
Angeles, California 90034.

2.      Defendant LJ is an individual who, upon information and belief, resides in New
York, New York and Los Angeles, California.

3.      Defendant TNFC is, upon information and belief, a company lawfully organized
and existing (or formerly existing) under the laws of the state of New York.

4.      This case involves questions of federal Copyright law, federal law for unfair competition, and Indiana and California State law for unfair competition.

5.      LMG and TNFC are citizens of different states. LMG asserts its claims herein pursuant to Rule 13 of the Federal Rules of Civil Procedure and under the Declaratory Judgment Act at 28 U.S.C. §§ 2201 and 2202. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(a), 1338(a). Consequently, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331; this Court also has subject matter jurisdiction over the claims in this Complaint arising under the Copyright Act pursuant to 17 U.S.C. §101 *et. seq.*

6.      This Court has personal jurisdiction over Defendants because Defendants are located in and transact business in this judicial district pursuant to 28 U.S.C. § 1391(a).

7.      Likewise, venue as related to Defendants is proper in this Court pursuant to 28 U.S.C. § 1391 (a) and (b). Since Defendants is subject to personal jurisdiction in this Judicial District, Defendants reside in this Judicial District for the purposes of 28 U.S.C. §1391.

8.      All conditions precedent to the bringing of this action have occurred or taken place and / or continue to occur.

## FACTUAL BACKGROUND

9.      Bruce Lee (hereinafter "LEE"), the world famous actor and martial artist, was born on November 27, 1940, in San Francisco, California, son of Lee Hoi Chuen, a singer with the Catonese Opera.

10.      LEE spent his adolescent years, however, with his family to Hong Kong where from infancy to the age of eighteen (18) LEE appeared in children's roles in over twenty (20) films including Golden Gate Girl (1941) and The Orphan (1960); at twelve (12) years of age, LEE attended La Salle College in Hong Kong and began training for the following five (5) years in the martial arts discipline of

wing chun kung fu and in cha-cha dancing wherein, at the age of eighteen, LEE was named cha-cha champion of Hong Kong.

11.     LEE returned to San Francisco, California in 1959 but later moved to Seattle, Washington where LEE studied philosophy and continued to hone his kung fu techniques; in the 1960's, while residing in Seattle, Washington, and, upon opening LEE's own school of kung fu, LEE became closely associated in the eyes of the American public with key American martial arts celebrities such as Ed Parker and Jhoon Rhee.

12.     In or about early 1964, LEE developed and utilized a trademark image which universally became so closely associated with LEE that the American and worldwide public, when seeing the image, would know and understand that it stood for LEE's self-developed martial arts principles of "Using No Way as Way, Having No Limitation as Limitation," a/k/a the Core Symbol®.

13.     After being discovered at a Kung Fu demonstration in Long Beach, California in 1964, at twenty-four (24) years of age, LEE was introduced to and began working with notaLMG Hollywood, California movie producer William Dozier; LEE later completed his first Hollywood screen test for Dozier in or about 1965 (the "Screen Test"); the Screen Test is over eight (8) minutes in length and has been used freely in countless productions over the last thirty (30) years and is widely available for view, at no cost, via Youtube.com, Firecold.com, Miramax.com, My Space, Facebook and other widely available Internet mediums. *https://www.google.com/#hl=en&sclient=psy-ab&q=bruce+lee+first+screen+test&oq=bruce+lee+first+screen+test&gs_l=hp.3..0i22i30.1228.5269.0.5456.27.14.0.12.12.1.193.1819.0j14.14.0...0.0...1c.1.14.psy-ab.JWaWuRmNP80&pbx=1&bav=on.2,or.r_cp.r_qf.&bvm=bv.46751780,d.aWc&fp=9c693b38e3102242&biw=1366&bih=667,* last viewed on May 17, 2013.

14.    Dozier later cast LEE in LEE's first national television show as "Kato," sidekick to cartoon superhero, the Green Hornet; The Green Hornet, co-starring LEE, aired for one season (1966) though it was through LEE's role as Kato that LEE first became a well-known entertainment celebrity in America.

15.    As a result of his notoriety, LEE opened a kung fu school in Oakland, California and later opened a school in Los Angeles, California where he trained well known Hollywood celebrities such as Steve McQueen and James Coburn; it was during this time that LEE, having studied, deconstructed and customized several martial arts styles and techniques for years, began cultivating his own expression of martial arts called Jeet Kune Do®(which translates in English to "The Way of the Intercepting Fist").

16.    Via LEE's close relationship with McQueen and Coburn, LEE landed a role as "Winslow Wong" alongside notable American movie star James Garner in Marlowe (1969); LEE's work in Marlowe was followed by several appearances as a martial arts instructor to a blind private eye in the television series Longstreet (1971) starring James Franciscus.

17.    In the early 1970's, LEE returned to Hong Kong where he was approached by film producer Raymond Chow who, intending to seize upon LEE's intense popularity amongst young Chinese fans, cast LEE in the lead role in The Big Boss (a/k/a Fists of Fury) (1971); though the film was very low budget, Chinese fans flocked to theaters to see LEE, then known worldwide as a tough, young athletic hero, dispense justice with his fists and with his feet. Ultimately, The Big Boss smashed all Hong Kong box office records.

18.    LEE later starred in another Chinese movie, Fist of Fury (a/k/a Chinese Connection) (1972) and, upon the movie's release, Hong Kong streets were once again jammed with thousands of LEE's fans, all of which seemingly would not get enough of LEE's martial

arts fury as captured on the big screen; Fist of Fury later went on to once again break box office records and unprecedented success in this movie genre led LEE to launch his own movie production company named Concord Productions.

19. Via Concord Productions, LEE personally wrote, directed, and acted in his next big screen success, Way of the Dragon / (a/k/a Return of the Dragon) (1972); Way of the Dragon was the movie debut for a young, up and coming American martial artist named Chuck Norris, who later went on to star in countless Hollywood film and television productions and who has become a household name in the United States movie industry.

20. By the time Way of the Dragon was released, LEE's remarkable and meteoric success in the Orient film industry was recaptured by American movie producers; in 1972, Warner Bros. cast LEE as a secret agent who was to penetrate a secret island fortress.

21. While LEE was involved in completing over dubs and final cuts for the 1973 Warner Bros. movie, LEE died on July 20, 1973 of cerebral edema; later, following his death, the immensely popular, cult movie favorite Enter the Dragon was released by Warner Bros.

22. Movie fans around the world were shattered by LEE's untimely death; over thirty thousand (30,000) fans paid final tribute to LEE in Hong Kong and, at a much more private, smaller ceremony in Seattle, Washington (the city where LEE began his trek toward celebrity stardom and immortality in earnest), celebrity pall bearers included Steve McQueen and James Coburn.

23. Enter the Dragon was such a post humus success, National General Films actively distributed LEE's prior three (3) films to United States movie theaters and each became box office smashes on the American big screen.

24. LEE was such an icon that, via the productions Game of Death (1978) and Game of Death II (1981), LEE became the first celebrity to be cast in major motion pictures after his death;

LEE's fans craved for his works to such an extent, that actual footage of LEE fighting several celebrity opponents, including LEE pupil and Los Angeles Laker Hall-of-Famer, Kareem Abdul-Jabbar, was used together with a LEE look-alike character and "shadowy" camera work in the <u>Game of Death</u> and the <u>Game of Death II</u>.

      25.    LEE is, without question, the greatest icon of martial arts cinema and is, unquestionably, a key figure in American popular culture; to this end, absent the unprecedented popularity of LEE's body of film works, it is arguable whether the martial arts film genre would have ever influenced mainstream Western cinema and audiences which later went on to produce Hollywood celebrities such as Chuck Norris and Steven Seagal as well as such ultra popular film genres as <u>The Matrix</u> triology, <u>Laura Croft: Tomb Raider</u>, and films starring Asian film celebrities Jackie Chan and Jet Li (in which LEE's influences are unmistakably evident).

      26.    LEE was known throughout the world and to his peers as not only an amazingly gifted athlete, but as a talented actor whose films left behind an indelible impression on Hollywood and modern cinema.

      27.    Since LEE's death, LEE's family (namely, LEE's widow, LEE's son (prior to his son's death on March 31, 1993), and LEE's daughter), as the sole and exclusive rights holders and proprietors of any and all commercial merchandising and allied rights relating to the use of LEE's name, image, likeness, persona, signature, mannerisms, distinctive appearance, sayings, voice, and / or photographs, copyrights and various trademarks and registered trademarks including but certainly not limited to the marks BRUCE LEE®, the Bruce Lee Signature®, the Core Symbol®, JEET KUNE DO®, LIXIAOLONG in Chinese Characters, JUN FAN GUNG FU INSTITUTE in Chinese Characters, JUN FAN JEET KUNE DO in Chinese Characters, JUN FAN JEET KUNE DO in Chinese Characters (all foregoing intellectual property rights as associated with the late Bruce Lee, unless otherwise noted, shall

hereinafter collectively be referred to as "Intellectual Property"), have continuously promoted, marketed, licensed, used and protected the Intellectual Property from misuse, in commerce.

29.     In or about 2004, Concord Moon LP, a California limited partner, and, its general partner, Concord Moon, LLC (itself organized in or about 1999), a California limited liability company, were organized by LEE's family as the exclusive rights holder of the Intellectual Property.

30.     On April 1, 2008, BLE was organized by LEE's family as the successor in interest to Concord Moon LP and Concord Moon, LLC as the sole and exclusive rights holders and proprietors of any and all commercial merchandising and allied rights relating to the Intellectual Property as herein defined.

31.     BLE is duly registered with the office of the Secretary of State of California in accordance with the requirements of California Civil Code §990, and its successor legislation under Civil Code § 3344.1 as the successor-in-interest and sole rights holder of the Intellectual Property.

### FACTS RELATED TO THIS CASE

32.     In or about early, 2012, the Bruce Lee documentary, I Am Bruce Lee, produced by LMG (the "Documentary"), was released and aired on Spike TV.

33.     The Documentary, approximately 94 minutes in length, showed why LEE may be more popular today than at the time of his death in 1973. The Documentary included interviews with the greatest martial artists, athletes, actors, directors, and producers in the entertainment business who shared their feelings about LEE. Moreover, the Documentary included interviews with celebrities from all genre whose lives, careers, and belief systems were forever altered LEE as well as rarely seen archival footage and classic photos will punctuate the personal testimonials.

*http://www.imdb.com/title/tt1954299/plotsummary?ref_=tt_ov_pl*, last viewed on May 17, 2013.

34.   Upon information and belief, approximately ninety-one (91) seconds of the Screen Test was included in the Documentary.

35.   Prior to the inclusion of Screen Test in the Documentary, LMG (and others) conducted an extensive and exhaustive search regarding the copyrights, if any, in and to the Screen Test; it was determined, after this search, that the Screen Test was in the public domain and that, as a result thereof, no clearance for the use of the Screen Test in the Documentary was required.

36.   Moreover, it was an industry wide belief over the course of in excess of thirty years of film productions associated with and involving Bruce Lee that there were no valid copyrights associated with the Screen Test and, in fact, that the Screen Test itself was in the public domain.

## NATURE OF THE CONTROVERSY

37.   In or about July, 2012, BLE and LMG were contacted by LJ who claimed to own the copyright in and to the Screen Test.

38.   Upon information and belief, LJ is not formally or otherwise associated with Dozier and / or the original 1965 production of the Screen Test.

39.   Between July 2012 and the date hereof, BLE engaged in a series of communications with LJ and counsel for LJ.

40.   Since the initial contact in July 2012, in-house counsel for LMG has requested LJ and / or counsel for LJ, provide LMG and / or BLE with evidence of the chain of title and copyright protection in and to the Screen Test.  To date, LJ and / or counsel for LJ have provided only the 1974 copyright registration for the Screen Test and a 1977 assignment from TNFC to LJ individually, which documents, upon information and belief, were actually not registered by LJ until in or about 2012.

41.   Despite countless requests, neither LJ nor counsel for LJ, have provided in-house counsel for LMG with any evidence as to the pre-registration (pre 1974) chain of title of the Screen Test.

42.    Likewise, upon information and belief, any copyright in and to the Screen Test claimed

by LJ (or others) is invalid because of the pre-1976 publication of the Screen Test without proper

copyright notice.

43.    On or about May 14, 2013, counsel for LJ informed in house counsel for LMG and BLE,

in writing (hereinafter the "Communication"), that, despite LMG's numerous requests for evidence as to

Defendants' copyrights in and to the Screen Test, Defendants were going to proceed with litigation

unless and until LMG and / or BLE, which, other than licensing some rights associated with LEE to

LMG for use in the Documentary, was not associated with the production of the Documentary, paid to

LJ a six figure settlement fee.

44.    Because Defendants, despite numerous demands by in-house counsel for LMG dating

back to July 2012, have provided in-house counsel for LMG with no evidence of Defendants' valid

copyright in and to the Screen Test outside of the 1974 copyright registration, upon information and

belief, the claims and demands made in the Communication were made without basis at law or in fact.

45.    The demands and threats made in the Communication have created an actual justiciable

claim or controversy such that declaratory relief represents the appropriate remedy; as such, LMG is

entitled to declaratory relief in this case.

## COUNT I
### (Declaration of No Valid Copyright)

46.    LMG restates, realleges, and reiterates its allegations in paragraphs 1. through 45. as if

fully set forth herein.

47.    Under the Copyright Act, for works first published on or after March 1, 1989, use a

copyright notice is optional in terms of the determination of whether a party has a valid, enforceable

copyright in and to a given work.

48.    Before March 1, 1989, under the pre-1976 Copyright Act, the use of the notice was

mandatory on all published works in terms of the determination of whether a party has a valid, enforceable copyright in and to a given work; in short, the omission of the copyright notice on any work first published before that date (March 1, 1989) will result in the loss of copyright protection.

49.     Because the Screen Test was produced prior the passage of the 1976 Copyright Act and was published, without valid notice, prior to March 1, 1989, LJ does not own a valid copyright in and to the Screen Test.

50.     Nevertheless there is an actual and justiciable controversy between the parties whether Defendants' assertions as against LMG and the inclusion of the Screen Test in the Documentary are actionable for copyright infringement.

51.     Absent a declaration that the copyright in and to the Screen Test claimed by Defendants is invalid, Defendants will continue to assert that LMG has infringed and is infringing, or is otherwise violating, those copyrights claimed by Defendants and in this way will cause LMG continuing and ongoing harm and damage.

52.     LMG seeks a declaration that the copyright claimed by Defendants in and to the Screen Test is invalid and therefore not enforceable.

## COUNT II
### (Declaration of No Standing)

53.     LMG restates, realleges, and reiterates its allegations in paragraphs 1. through 52. as if fully set forth herein.

54.     Under the Copyright Act, copyrights are property rights, fully transferrable and descendible.

55.     A party asserting a valid, enforceable copyright must demonstrate that the asserting party has title in and to the copyright asserted or the asserting party will be deemed to have no standing to pursue a copyright infringement action as to the copyright asserted by that party.

56.     Because Defendants cannot show valid chain of title in and to the Screen Test which ends in Defendants being the valid copyright holders in and to the Screen Test, Defendants have no standing from which to assert a copyright claim against LMG as to the use of the Screen Test in the Documentary.

57.     Nevertheless there is an actual and justiciable controversy between the parties whether Defendants' assertions as against LMG and the inclusion of the Screen Test in the Documentary are actionable for copyright infringement.

58.     Absent a declaration that Defendants do not have standing to assert a copyright claim in and to the Screen Test, Defendants will continue to assert that LMG has infringed and is infringing, or is otherwise violating, those copyrights claimed by Defendants and in this way will cause LMG continuing and ongoing harm and damage.

59.     LMG seeks a declaration that the copyright claimed by Defendants in and to the Screen Test is invalid and therefore not enforceable.

### COUNT III
### (Declaration of No Copyright Infringement)

60.     LMG restates, realleges, and reiterates its allegations in paragraphs 1. through 60. as if fully set forth herein.

61.     Defendants claim that the inclusion of the Screen Test in the Documentary is actionable under the Copyright Act as against LMG.

62.     The use of the Screen Test in the Documentary is not actionable under the Copyright Act.

63.     Because the use of the Screen Test in the Documentary is not actionable under the Copyright Act, Defendants cannot assert a valid copyright claim against LMG as to the use of the Screen Test in the Documentary.

64.     Nevertheless there is an actual and justiciable controversy between the parties whether

Defendants' assertions as against LMG and the inclusion of the Screen Test in the Documentary are actionable for copyright infringement.

65.     Absent a declaration that the use of the Screen Test in the Documentary is not actionable for copyright infringement, Defendants will continue to assert that LMG has infringed and is infringing, or is otherwise violating, those copyrights claimed by Defendants and in this way will cause LMG continuing and ongoing harm and damage.

66.     LMG seeks a declaration that the inclusion of the Screen Test in the Documentary is not actionable under the Copyright Act.

**COUNT IV**
**(Declaration of No Unfair Competition)**

67.     LMG restates, realleges, and reiterates its allegations in paragraphs 1. through 66. as if fully set forth herein.

68.     Defendants claim that that the use of the Screen Test in the Documentary constitutes unfair competition under federal and California state laws.

69.     LMG has not engaged and / or is not engaging in activities that arise to unfair competition as alleged under the laws of the United States, California law, Indiana law, and / or the common law as claimed by Defendants and LMG is therefore not liable for unfair competition under those laws for LMG's alleged use of the Screen Test in the Documentary.

70.     There is an actual and justiciable controversy between the parties whether LMG has engaged in unfair competition with regard to its alleged use of the Screen Test in the Documentary.

71.     Absent a declaration that LMG's conduct does not violate unfair competition law, Defendants will continue to assert that LMG has and is violating those laws and in this way will cause LMG ongoing and continuing harm and damage.

72.     LMG seeks a declaration that it is not engaging in unfair competition by way of the inclusion of the Screen Test in the Documentary.

## JURY DEMAND

73.     LMG hereby demands a trial by jury on all issues to be properly tried to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff LEEWAY MEDIA GROUP, LLC (LMG), by counsel Theodore J. Minch, hereby respectfully prays for judgment against Defendants LAURENCE JOACHIM, an Individual (hereinafter "LJ") and TRANS-NATIONAL FILM CORPORATION (hereinafter "TNFC") (LJ and TNFC may be hereinafter collectively referred to as the "Defendants") and requests that the Court:

1.     Declare that Defendants have no copyrights in and to the Screen Test as defined hereinabove and / or, in the alternative, that Defendants' chain of title in and to the Screen Test is flawed and, as such, Defendants have no standing from which to bring an action for copyright infringement and / or unfair competition, under federal or California state law, as to the Screen Test itself;

2.     Declare that LMG has not infringed, is not infringing, and is not otherwise liable for any perceived violation of Defendants' alleged rights in and to the Screen Test as defined hereinabove and / or, in the alternative, that even if LMG has infringed on Defendants' alleged rights in and to the Screen Test as defined hereinabove, LMG did not knowingly and / or willfully infringe on said rights;

3.     Declare that LMG has not used, and is not using, the Screen Test in violation of federal unfair competition law;

4.     Declare that LMG's use of the Screen Test in the Documentary does not constitute copyright infringement;

5.     Declare that LMG's actions, as alleged herein, do not arise to a cause of action for unfair competition under Indiana and / or California state law and / or federal law

6.     Award LMG its reasonable attorneys' fees and costs;

7.     Declare that counsel for Defendants' actions with regard to the negotiation of a potential settlement of any and all claims for copyright infringement and unfair competition are in bad faith and, as such sanctionable; and

8.    Award LMG all other and further relief as is just, necessary, and proper in the premises.

DATED:        May 17, 2013                         Respectfully submitted,
              Indianapolis, Indiana

                                                   _____
                                                   Theodore J. Minch (IN #18798-49)
                                                   SOVICH MINCH, LLP
                                                   Attorneys for Bruce Lee Enterprises, LLC
                                                   10099 Chesapeake Drive, Suite 100
                                                   McCordsville, Indiana 46055
                                                   (317) 335-3601 (t)
                                                   (317) 335-3602 (f)
                                                   tjminch@sovichminch.com